# In the United States Court of Federal Claims

No. 12-708 C
(Filed Under Seal: March 27, 2013)
(Reissued: April 11, 2013)[*]

```
*************************************
CW GOVERNMENT TRAVEL, INC.,          *
d/b/a CWTSATOTRAVEL,                 *
                                     *
            Plaintiff,               *       Postaward Bid Protest; 28 U.S.C.
                                     *       § 1491(b); Standing; Timeliness;
v.                                   *       FAR 16.504(c)(1)(ii)(D)(1)(iii); Qualified
                                     *       and Capable; Unequal Treatment; Injunctive
THE UNITED STATES,                   *       Relief
                                     *
            Defendant,               *
                                     *
and                                  *
                                     *
CONCUR TECHNOLOGIES, INC.,           *
                                     *
            Defendant-Intervenor.    *
*************************************
```

Lars E. Anderson, James Y. Boland, and Christina K. Kube, Tysons Corner, VA, for plaintiff.

Russell J. Upton, United States Department of Justice, Washington, DC, for defendant.

Jonathan D. Shaffer, John S. Pachter, Mary Pat Buckenmeyer, and Armani Vadiee, Tysons Corner, VA, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Judge

Plaintiff CW Government Travel, Inc., d/b/a CWTSatoTravel ("CWT") protests the General Services Administration's ("GSA") decision not to award CWT an indefinite-delivery, indefinite-quantity ("IDIQ") contract in response to Solicitation No. QMAD-JM-100001-N

---

[*] The parties proposed joint redactions to the court's decision, with the exception of certain quotations from defendant-intervenor's (the awardee's) proposal that only the government and defendant-intervenor requested be redacted. Because the competition is ongoing, and in the event plaintiff receives an award, it will be competing against defendant-intervenor at the task order level, the court has redacted this information as requested by defendant and defendant-intervenor.

("solicitation" or "RFP") for travel management services for federal civilian agencies under the E-Gov Travel Service 2.0 ("ETS2") program. Pending before the court are plaintiff's motions for judgment upon the administrative record and for declaratory and injunctive relief; defendant's motion to dismiss or, in the alternative, cross-motion for judgment upon the administrative record; and defendant-intervenor's cross-motion for judgment upon the administrative record. Also pending before the court are plaintiff's, defendant's, and defendant-intervenor's motions to strike.

There are several issues raised by the parties. The first issue is, as a threshold matter, whether CWT has standing to bring this challenge. The next issue is, also as a threshold matter, whether CWT's protest is timely. With respect to the merits, the issues are, in CWT's words, whether the following government actions were arbitrary, capricious, constituted an abuse of discretion, or otherwise not in accordance with the law: (1) finding that the awardee, Concur Technologies, Inc. ("Concur"), was the only source qualified and capable of performing the ETS2 work under Federal Acquisition Regulation ("FAR") 16.504(c); (2) accepting Concur's assurances of postaward corrections, revisions, or updates to Concur's ETS2 system, while disqualifying CWT for promising to meet outstanding requirements after award; and (3) permitting Concur to take exception to mandatory solicitation requirements and rely on "promises" of compliance after award. Finally, assuming that CWT has established success on the merits, whether it has suffered irreparable harm that outweighs the harm to the government and Concur if injunctive relief is not granted. For the reasons set forth below, the court grants plaintiff's request for injunctive relief and denies the motions to strike.

## I. FACTUAL BACKGROUND

### A. The Procurement and the RFP

The ETS2 contract is the successor to the ETS1 (E-Gov Travel Service) contract currently in operation.[1] Three contractors, CWT, Northrop Grumman Missions Systems, and Electronic Data Systems (later novated to Hewlett-Packard), were awarded ETS1 contracts that run from November 2003 to November 2013. Tab 1 at AR 1. Seventy-six federal agencies currently use ETS1 contracts, Tab 73 at AR 4677, which represents approximately ninety percent of government travel expenses for executive branch agencies, excluding the United States Department of Defense. Tab 103 at AR 5292.

In anticipation of the November 2013 expiration of the ETS1 contracts, GSA began preparations for ETS2 in 2009. Tab 73 at AR 4677. The ETS2 solution requires integration with agency systems, such as financial systems, human resource systems, and charge card vendors, to allow the efficient operation of travel authorization, booking, fulfillment, and vouchering. Tab 2 at AR 149. GSA anticipates that it will take agencies twenty-four months, on average, to fully integrate their individual systems with the contractor's system to begin performance of ETS2 travel services. Tab 150 at AR 8319. Initially, the ETS2 contract award was anticipated in early 2011, Tab 118 at AR 6598, to ensure adequate lead time for the agencies to transition to ETS2

---

[1] The facts are derived from the administrative record, which will be cited as "Tab __ at AR __."

when ETS1 expires in November 2013.  Tab 73 at AR 4677.  Following CWT's first preaward protest before the United States Government Accountability Office ("GAO"), however, GSA was forced to push back the ETS2 award date by several months.  Tab 115 at AR 6459-60.  The ETS2 award date was pushed out further due to additional preaward protests filed by CWT.  Tab 128 at AR 7654.

After GAO's recommendation regarding CWT's second preaward protest, Tab 75 at AR 4722-36, GSA reopened the solicitation until July 6, 2011, allowing CWT to submit a revised proposal.  Tab 76 at AR 4741.1.  Based upon these delays and the lead time required for ETS2 to be fully operational, GSA determined that, in order to ensure continual service, it was necessary to extend the ETS1 period of performance while agencies worked toward a timely transition to ETS2.  Tab 128 at AR 7653.  In early 2012, all three ETS1 contractors agreed to contract modifications providing for potential option periods.  Tab 127 at AR 7600-47.  The options, if exercised, will extend ETS1 contract performance for a one-year term and for up to four additional three-month periods, which could take ETS1 through November 2015.  Tab 128 at AR 7653.

Like the predecessor program, the ETS2 RFP calls for the provision of a consolidated and centralized "Web-based, self-service solution offering End-to-End commercial travel management services," and covers all aspects of official federal business travel.  Tab 2 at AR 55.  Use of an electronic travel system is required by the Federal Travel Regulation for civilian agency travel.  Id.  GSA intended to award one or more master IDIQ contract vehicles against which civilian agencies will later conduct agency-specific competitions for task orders when their ETS1 contracts end.  Id. at AR 699.  ETS2 contains numerous enhancements and additional requirements, including some based upon laws and regulations implemented since the 2003 award of ETS1, and incorporates changes in the electronic travel service industry since 2003.  Id. at AR 55-57.  ETS2 also incorporates emerging technologies, such as cloud computing, that include on-demand self-service, ubiquitous network access, location-independent resource pooling, rapid elasticity, and measured-service performance.  Id.   ETS2 is intended to deliver a user-friendly, customer-centric, configurable, policy-compliant, reliable, and secure automated civilian federal agency-wide travel service, building upon lessons learned from ETS1, but adding improvements by bringing more clarity to the government's desired performance outcomes in usability and contractor performance.  Tab 1 at AR 11.

## B. Evaluation Criteria and Ratings

GSA decided to limit the number of ETS2 contract awards to a maximum of two (the minimum allowed by law) based on a best value analysis among the offerors.  Tab 118 at AR 6568 (stating that "more than two awards will inhibit the ability to successfully re-procure ETS2").  The evaluation consisted of two phases.  For Phase I, section F.3 of the RFP provided that "[t]his is a best value source selection," and that "best value" will be based on the following evaluation factors:  Technical (Performance Work Statement, Project Management Plan, Demonstration, and Key Personnel/Resumes); Non-Technical (Socio-Economic and Past Performance); and Price.  Tab 2 at AR 740-41.  Section F.5 established the criteria for the Phase II evaluation, which consisted of Independent Verification & Validation ("IV&V") of the proposed ETS2 solutions.  Id. at AR 767-70.  The RFP provided that the "determination of which

Offeror(s) moves forward to IV&V will depend on the outcome of Phase I evaluations and will be based on the evaluation team's consensus ratings." Id. at AR 768. The criteria for the IV&V phase were as follows: IV&V Technical Factors (Computational Ratings, Functional/Usability, Security, and Section 508/Accessibility),[2] and IV&V Non-Technical (Price). Id. at AR 770.

The RFP established five possible ratings for the nonprice factors: Outstanding, Very Good, Acceptable, Marginal, and Unacceptable. Id. at AR 767. Of relevance here, Marginal was defined as: "A marginal proposal does not meet Government requirements necessary for acceptable contract performance, but issues are correctable. The Offeror's proposal contains one or more significant weaknesses." Id. Unacceptable was defined as:

> An unacceptable proposal fails to meet the preponderance of specified minimum performance and technical capability requirements defined in the [Statement of Work]. The Offeror's proposal contains numerous weaknesses and/or deficiencies, or contains weaknesses and/or deficiencies that are not correctable. The evaluator is confident that the Offeror will be unable to successfully complete the required tasking. The proposal does not adequately acknowledge or address risk, mitigate risk, or may actually introduce risk.

Id.

For both Phase I and Phase II, GSA would evaluate total price, but only to verify that evaluated prices were "reasonable and realistic." Id. at AR 745, 771. For a price to be reasonable, the government stated that it "must represent a price to the [g]overnment that a prudent person would pay in the conduct of competitive business." Id. at AR 745. For purposes of price evaluation, the government would evaluate the sum of the base period pricing for the contract line item numbers ("CLINs") identified in the RFP and their corresponding option period pricing based on the government's estimated quantities to determine the overall contract price. Id. In the solicitation, GSA requested proposals with pricing for nineteen CLINs. Id. at AR 772-73. CLINs 1-5 (and their associated option CLINs) were for services that will be requested at the task order stage by all customer agencies when each agency seeks to integrate its system with the awardee's ETS2 system, while CLINs 6-19 (and their associated option CLINs) were for services that not all customer agencies will request. Id.

Because GSA decided to limit the number of awards to only two, there were only two possible award scenarios under the RFP: a single award or a dual award. Id. GSA was obligated to make a dual award unless a valid exception existed, and GSA required offerors to submit pricing for both a single-award and dual-award scenario. Id. The RFP thus provided that the government would evaluate prices under both scenarios, as well as the reasonableness and realism of the "[s]ingle award v. dual award variance" in pricing. Id.

---

[2] Section 508 of the Rehabilitation Act of 1973, as amended by the Workforce Investment Act of 1998 (Public Law No. 105-220), requires the government to ensure that federal employees with disabilities have access to and use of services, information, and data that is comparable to that of employees without disabilities. "The goal for ETS2 is to provide equivalent access to Electronic and Information Technology (EIT) resources to all users regardless of disabilities . . . ." Tab 2 at AR 148.

## C.  Evaluation of Initial Proposals

GSA received two timely, alternate proposals (proposal A and B) from Concur on January 18, 2011.  Tab 73 at AR 4679.  After the new July 6, 2011 proposal deadline was established, Tab 76 at AR 4741.1-.3, CWT submitted its timely proposal and Concur submitted revised proposals (proposal A and B).  Tab 73 at AR 4679.  The proposals were evaluated by a multiagency source selection evaluation team in a two-phase source selection.  Id. at AR 4680.  Phase I included evaluation of technical factors, nontechnical factors, and price.  Tab 2 at AR 740; Tab 73 at AR 4680.  After Phase I evaluations, both offerors were determined to have strengths and weaknesses.  Tab 74 at AR 4717-21; Tab 77 at AR 4745.  In addition to weaknesses, CWT's initial proposal also had significant weaknesses and a deficiency, Tab 77 at AR 4745, while Concur's initial proposals in Phase I did not have any significant weaknesses or deficiencies.  Tab 74 at AR 4717-18; Tab 77 at AR 4745.  The Source Selection Advisory Council ("SSAC") and Source Selection Authority ("SSA") decided to include both offerors in the competitive range.  Tab 77 at AR 4751.

Under Phase II, IV&V testing, each offerors' ETS2 solution was independently evaluated by the IV&V technical team using test scenarios designed to validate the proposed solution.  Tab 115 at AR 6455.  The purpose of IV&V testing was to review the proposed ETS2 solution against the stated requirements and objectives in the RFP.  Tab 2 at AR 768.  Whereas under Phase I, the offeror only had to conduct a live demonstration of its ETS2 solution, id. at AR 744, Phase II was a comprehensive, independent test of electronic travel service scenarios to determine whether the ETS2 solution could perform the services offered in the Performance Work Statement, in the manner offered in the Project Management Plan.  Id. at AR 767-73; Tab 115 at AR 6468.  The IV&V tests evaluated the computational accuracy of the service (e.g., the accuracy of the services, proper application of the Federal Travel Regulation in terms of meals and incidental expenses, lodging, and adjustments based on the traveler going over the International Date Line); the functionality/usability of the service (e.g., how the service would function when used for routing, workflow and notifications, policy enforcement, types of travel, and online booking); the security of the service (e.g., conducting a modified Certification and Accreditation); and the Section 508/Accessibility of the service (e.g., the extent to which the proposed solution met applicable accessibility standards).  Tab 2 at AR 768-70.

## D.  Discussions

On December 6, 2011, GSA notified each offeror in writing of the areas of their Phase I technical proposals that needed attention in the form of additional information, clarifications, and/or discussions.  Tab 73 at AR 4682.  GSA requested that offerors respond to each issue by December 13, 2011.  Tabs 82-84.  On December 9, 2011, GSA issued a second written notification to each offeror regarding areas of their Phase I technical proposals that needed to be addressed in the offeror's final proposal revisions ("FPRs").  Tabs 85-87.

On December 13, 2011, both offerors submitted responses to the December 6, 2011 letters.  Tabs 88-90.  CWT stated that its proposal demonstrated "over 70 percent of the 1,000 plus requirements," that some of the remainder of the functionality would be implemented in a January 2012 refresh of its ETS1 solution, called "E2 Solutions," and the "final set of

requirements" would be implemented in November 2012, which was after contract award. Tab 90 at AR 4937. On December 22, 2011, GSA issued to each offeror a third written notification of Phase II, IV&V testing weaknesses, significant weaknesses, and deficiencies. Tab 73 at AR 4683. Offerors were asked to be prepared to discuss these matters during negotiation discussions and to address these issues in their FPRs. Tabs 91-92. GSA held detailed discussions with offerors from January 9 to 20, 2012. Tab 73 at AR 4686. Each offeror had four-and-one-half days to discuss the significant weaknesses, weaknesses, and deficiencies in their respective proposals. Id.

## E. Revised Proposals

Both offerors submitted FPRs on February 15, 2012, and Phase II, IV&V retesting was conducted between February 16 and 23, 2012. Tab 73 at AR 4687. In the IV&V retest, both offerors increased their respective pass rating for test scenarios and improved some ratings. Id.

### 1. Concur

Concur's FPR passed all test scenarios that GSA retested. Id. GSA increased Concur's IV&V rating from Marginal on the Computational, Functional/Usability, and Security factors to Acceptable, but its proposal remained Marginal on the IV&V factor concerning Section 508/Accessibility. Id. at AR 4690. The Marginal rating it received under Section 508/Accessibility was based upon its ETS2 solution having "unlabeled HTML elements which impeded 508 testing and operation." Id. at AR 4687-88. GSA determined, however, that Concur's remediation plan for this remaining significant weakness was a clearly defined, postaward mitigation strategy to correct the Section 508 compliance issue within ninety days of contract award, which was determined to be acceptable. Tab 120 at AR 7257-58. Also, GSA determined that the correction would be completed before the Authority to Operate ("ATO") and Assessment and Authorization ("A&A") would be complete. Id. Concur's FPR received an overall technical rating of Very Good. Tab 103 at AR 5277.

### 2. CWT

CWT's FPR passed sixty-eight of the eighty-seven test scenarios that were retested in IV&V. Tab 73 at AR 4687. CWT corrected many of the weaknesses, significant weaknesses, and deficiencies noted in GSA's December 6, 9, and 22, 2011 letters, but it failed to correct its FPR in certain respects. Tab 103 at AR 5277-78; Tab 121 at AR 7403-04, 7409-11, 7423-29. Like Concur, CWT submitted a remediation plan with its FPR. Tab 113 at AR 6380, 6385-442. GSA determined the proposed remediation plan for addressing Section 508 compliance was acceptable. Id. at AR 6441-42. Just like Concur's weakness in this area, CWT's rating was not negatively affected by this weakness. Tab 103 at AR 5278, 5312. The evaluators, however, found CWT's remediation plan insufficient to address the other significant weaknesses in CWT's FPR. Tab 121 at AR 7403-04, 7409-11, 7413-15, 7422-30.

In particular, CWT's FPR for Technical Factor One, Performance Work Statement (Phase I), did not meet ninety-nine mandatory requirements. Tab 103 at AR 5291. CWT indicated that it would deliver these functionality requirements by a date it set, November 2012.

Tab 113 at AR 6091.  Therefore, these ninety-nine requirements could not be retested during the final evaluation process before contract award, resulting in a significant weakness in CWT's ETS2 solution.  Tab 73 at AR 4688; Tab 103 at AR 5326-27.  Significant weaknesses remained in other areas of CWT's FPR, including CWT's failure to offer government-wide, summary-level reporting capability in its proposal under Technical Factor One, Performance Work Statement (Phase I) in accordance with the RFP requirement, and its failure to offer to the user a means to optionally select the most applicable explanatory codes under Technical Factor Two, Project Management Plan (Phase I) in accordance with the RFP requirement.  Tab 109 at AR 5571-73.  Significant weaknesses also remained in the area of Technical Factor Two, Functional/Usability (Phase II).  Tab 103 at AR 5278, 5311.  Further, CWT's FPR also contained a significant weakness under Phase II, IV&V Factor 4, Section 508/Accessibility.  Id. at AR 5368.

Lastly, CWT did not address the security deficiency concerning its failure to offer the disaster recovery site required by the RFP.  Tab 2 at AR 126.  In its December 22, 2011 letter to CWT, GSA identified as a deficiency that "CWT's subcontractor, [ . . . ], does not have a Data Recovery Center; there are no continuity or disaster recovery plans; and all backup tapes are stored at the same site[; t]he Government data is at risk if the contractor is not prepared to recover after a potential disaster and there is no plan on how to resume services or recover losses."  Tab 92 at AR 5074.  GSA requested CWT describe in its FPR how it would remediate its security deficiency related to its lack of a disaster recovery site.  Id. at AR 5016, 5074, 5075.  CWT proposed to review and address this crucial security deficiency with CWT's information system security officer and [ . . .] security personnel, and to have a remediation effort in place for A&A (the certification and accreditation process performed by GSA prior to the contractor receiving ATO).  Tab 113 at AR 6440.  However, CWT's plan was not considered sufficient, and the evaluators determined that CWT's security deficiency remained a deficiency in the final evaluation.  Tab 103 at AR 5278.  Accordingly, the evaluators determined that this deficiency could jeopardize CWT's "ability to secure the necessary security clearances to operate ETS2."  Id.  In the final evaluation, CWT's FPR received an overall rating of Marginal.  Id. at AR 5311.

The Proposal Analysis Report ("PAR"), prepared by the SSAC, summarized the evaluation of both offerors' FPRs and is an attachment to the Source Selection Decision Document and Recommendation for Award ("SSDD").  Id. at AR 5305.  In the PAR, the government determined that while Concur's proposal A included additional services not offered under its proposal B, these added services were not deemed to be worth the additional price.  Id. at AR 5321.  Thus, between the two Concur proposals, proposal B was determined to offer better value to the government.  Id.

The SSAC then compared Concur's proposal B to CWT's proposal and determined that, between the two, CWT's proposal had the lowest technical rating at the highest price.  Id.  Notably, the SSAC concluded that CWT's proposal did not meet ETS2 requirements in the areas of integration, group authorization functionality, availability of trip types, local voucher availability, retained advances, and government-wide reporting, in addition to other significant weaknesses and weaknesses and one deficiency.  Id. at AR 5326-27.  The SSAC also concluded that the Source Selection Evaluation Board's ("SSEB") determination—that the evaluated IV&V

security deficiency and CWT's numerous significant weaknesses outweighed the strengths identified in CWT's proposal and its overall rating of Marginal—was warranted. Id. at AR 5329; Tab 121 at AR 7404, 7409, 7424, 7427-29. The SSAC decided that Concur's proposal B, with its Very Good rating was, therefore, the only offeror remaining in the competition that was qualified and capable of performing the work at a reasonable price. Tab 103 at AR 5329. The SSAC concluded that Concur's single-award price was significantly less costly to the government than dual-award prices would be. Id. at AR 5329-31. CWT's single-award price of $1,427,876,623 was $231 million (19%) higher than Concur's proposal B single-award price of $1,196,549,911, while CWT's dual-award price of $1,562,846,138 was $216 million higher (30%) than Concur's proposal B dual-award price of $1,347,148,895. Id. at AR 5287-88, 5295. At the same time, the government acknowledged the preference for a dual award and that a dual award would reduce risk to the government. Id. at AR 5329-30. The SSAC also discussed the risks associated with making a single award to Concur, but concluded that those risks could be closely administered and mitigated. Id. Based upon these facts and conclusions, the contracting officer and SSEB prepared the SSDD.

## F. The SSDD

In the SSDD, the contracting officer, who also served as the SSA, summarized the evaluations, discussed pricing assumptions made by each offeror, recognized the strong preference for multiple-award IDIQ contracts, explored the benefits and risks of a single award and a dual award, and discussed the preference for dual award over a single award. Id. at AR 5275-93. Ultimately, the recommendation was based upon these conclusions reached in the PAR: (1) CWT's FPR indicated that it is not capable of fulfilling the government's requirements before award; (2) CWT's FPR was not as competitive as Concur's proposal B from both a technical and price standpoint; (3) Concur is the only qualified and capable source of performing the work at a reasonable price; (4) single award is less costly than dual award; and (5) the risks associated with a single award can be controlled through close administration and mitigation measures. Id. at AR 5293-300.

## G. Determination and Findings

Once the SSA made his decision that a single contract should be awarded to Concur, the contracting team prepared the Determination and Findings ("D&F") to support the single IDIQ contract award pursuant to FAR 16.504(c). Tab 104. The D&F summarized the key stages of the procurement and the technical and price evaluation findings made by the SSEB and the SSA. See generally id. In particular, the D&F noted that:

a. CWTSatoTravel had the lowest technical rating and the highest price, for both single and multiple award scenarios.

b. Concur Proposals A and B were technically equal. Proposal A offered no distinct advantages that would merit the increased price over Proposal B. As stipulated by the RFP, as technical merit becomes more equal, price becomes more important. Accordingly, Proposal B offered the better value over Proposal A.

- 8 -

c. Concur Proposal A shared the highest technical rating with its Proposal B, and was in the mid range price, for the single and multiple award scenarios.

d. Concur Proposal B shared the highest technical rating, and had the lowest price, for both single and multiple award scenarios. Concur B, Single Award, has the lowest evaluated price of $1,196,549,911. By comparison, the next highest proposed price is Concur A, Single Award, in the amount of $1,352,997,478, which is $156,447,567 (13%) higher than Concur B. The highest proposed price for Single Award is CWTSatoTravel's proposed price of $1,562,846,138, which is $231,326,712 (19%) higher than Concur B, Single Award price.

Id. at AR 5398-99. The SSA then stated:

> The SSAC and the SSA agreed that a single award to CWTSatoTravel was not possible as CWTSatoTravel was the technically inferior and higher priced offer. The SSAC and the SSA agreed that should a single award determination be made, Concur is the only contender for it.

Id. at AR 5399 (emphasis added). The SSA compared the benefits and risks of single and multiple awards. Id. at AR 5399-5403. One of the benefits of a single award was that the government would "obtain [the] best price for all Government customers," and the SSA noted that Concur offered a lower price than CWT. Id. at AR 5399. The SSA cited one of the benefits of a dual award as: "There is a strong FAR preference for multiple awards." Id. at AR 5400.

> The SSA then discussed the "cost/technical tradeoff" that was performed:

> The Source Selection Authority's cost/technical tradeoff analysis resulted in a determination that Concur Technologies, Proposal B, is superior to CWTSatoTravel in overall technical merit and is lowest in the evaluated price, representing a lower risk of performance issues at a more favorable price. The Government selects Concur as the awardee based upon an integrated assessment of all factors stated in the Solicitation, including Price. Concur is deemed responsible in accordance with the Federal Acquisition Regulation, its proposal conforms to the Solicitation requirements (to include all stated terms, conditions, representations, certifications, and all other information required by this solicitation) and is judged, based on the evaluation factors, to offer the most advantageous contract solution to the Government.

Id. at AR 5403 (emphasis added). The SSA noted that because the value of the contract exceeded $103 million, FAR 16.504(c)(1)(ii)(D)(1) "requires that the agency head make a determination prior to the award of any single award task and delivery order contract" that addresses one of the exceptions in that FAR provision. Id. at AR 5404. The SSA relied upon the exception found at FAR 16.504(c)(1)(ii)(D)(1)(iii), which permits the government to make a single award that will exceed $103 million where there is "[o]nly one source [that] is qualified

and capable of performing the work at a reasonable price to the Government." Id. The SSA stated:

> Concur is the only source qualified and capable of performing the work at a reasonable price to the Government. Both offerors have evaluated strengths and weaknesses in their proposals. Concur's overall rating of Very Good reflects the SSEB's determination that the strengths, which were significant in number and/or individual importance, outweighed Concur's evaluated minor weaknesses.

Id.

In the D&F, the SSA then discussed how CWT did not meet the government's requirements, citing ninety-nine requirements that CWT failed to meet and promised to meet months after award and a deficiency assigned under Phase II, IV&V Factor Three, Security. Id. at AR 5404-05. The SSA concluded that based on the deficiency and weaknesses in CWT's proposal, CWT's proposal "d[id] not meet requirements for contract award" and "is not technically acceptable for contract award." Id. at AR 5405.

With respect to price, the SSA noted that the Price Evaluation Board found "Concur's price assumptions to be fair and reasonable," whereas "some" of CWT's "price assumptions [were] reasonable." Id. The SSA then commented that eleven of thirty-one price assumptions offered by CWT represented cost and/or performance risk and were considered unreasonable. Id. The SSA determined that "Concur Technologies, Proposal B, is superior to CWTSatoTravel's proposal in overall technical merit and is lowest in evaluated price, representing less risk of performance issues at a more favorable price." Id. at AR 5406.

In conclusion, the SSA stated:

> Based on the findings above, only one source is qualified and capable of performing the work at a reasonable price to the Government. In accordance with Agency procedures outlined in FAS Memorandum dated December 3, 2009, approval authority has been delegated from the Head of the Agency to the Assistant Commissioner of the Office of Travel, Motor Vehicle and Card Services. Therefore, pursuant to FAR 16.504(c)(1)(ii)(D)(l)(iii), only one source, Concur Technologies, Inc., is qualified and capable of performing the work at a reasonable price to the Government.

Id. The D&F was signed by the SSA and various agency officials on May 22, 2012. Id. at AR 5406-07.

## II. PROCEDURAL BACKGROUND

### A. Prior Protests

CWT has filed several protests related to this procurement. In November 2010, CWT filed a preaward protest before GAO (B-404479) in which it challenged the solicitation's terms.

Tab 132 at AR 7720-826. In response, GSA notified GAO that it intended to take corrective action by amending the solicitation. Tab 133 at AR 7827. GAO thus dismissed the protest as academic. Tab 135 at AR 7843-44.

In January 2011, CWT filed a second GAO preaward protest (B-404479.2) in which it argued that GSA's corrective action was inadequate. Tab 62 at AR 4481-592. In April 2011, GAO denied all protest grounds but one regarding whether the RFP's "stated objectives" were required. Tab 75 at AR 4722-36. On June 3, 2011, GSA issued Amendment 13 to clarify this one issue. Tab 76 at AR 4741.1, 4741.2. On July 6, 2011, CWT submitted its proposal and Concur submitted revised proposals. Tab 73 at AR 4679.

In May 2011, before GSA issued the RFP clarification on the issue of "stated objectives," CWT filed a preaward protest before the United States Court of Federal Claims ("Court of Federal Claims") arguing, among other things, that GSA had not obtained the proper waiver to enter into a fifteen-year fixed-price contract. CW Gov't Travel, Inc. v. United States, 99 Fed. Cl. 666, 669 (2011). On September 16, 2011, the Court of Federal Claims issued its decision, concluding that although GSA had obtained a waiver, its waiver was deficient. Id. at 681. On December 20, 2011, GSA rectified this deficiency. Tab 166 at AR 8573-80. On May 31, 2012, GSA awarded a single IDIQ contract to Concur. Tab 106 at AR 5551-66. After receiving a written debriefing, Tab 109 at 5571-679, CWT filed a postaward protest at GAO (B-404479.3), Tab 111 at AR 5682-737, and subsequently supplemented its protest grounds, Tab 126 at AR 7536-99.

On September 24, 2012, GAO issued its unredacted recommendation in which it denied CWT's protest. Tab 146 at AR 8167-81. Specifically, GAO found that GSA evaluated both offerors equally and in accordance with the RFP. GAO also determined that GSA complied with the requirements in FAR 16.504(c) because the record reflected a reasonable basis for the agency's determination that CWT was technically unacceptable.

## B. The Current Protest

On October 18, 2012, CWT filed this postaward protest. In its complaint, CWT alleges, among other things, that GSA's single award decision violated FAR 16.504(c)'s prohibition against awarding a major IDIQ contract to a single source and that GSA engaged in unequal treatment. CWT seeks:

 (a) a judgment declaring that GSA's determination that Concur is the only source qualified and capable of performing the ETS2 work was arbitrary, irrational and capricious;

 (b) a judgment declaring that GSA's decision to award only one IDIQ contract violates federal procurement law since Concur is not, in fact, the only source qualified and capable of performing the work;

 (c) a judgment declaring that GSA violated federal procurement law by treating CWT and Concur unequally;

(d) a judgment declaring that GSA's evaluation of Concur's proposal was arbitrary, irrational, and unfair;

(e) an injunction directing GSA to award a second IDIQ contract to CWT;

(f) CWT's costs of purs[u]ing this protest; and

(g) [a]ny other relief the Court deems just and proper.

Compl. 47.

On November 21, 2012, plaintiff filed its motion for judgment on the administrative record, and on December 20, 2012, the government filed its motion to dismiss pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") or, in the alternative, cross-motion for judgment on the administrative record. Concur filed its cross-motion on the same day. Defendant and Concur filed motions to strike the declaration of Robert McCauley, Vice President of E2 Solutions at CWT, that was filed by CWT. CWT then filed a motion to strike the declaration of Ernesto Martinez, the contracting officer, and to strike portions of defendant's reply brief. The parties fully briefed the issues, and oral argument was held on February 14, 2013.

## III. LEGAL STANDARDS

### A. RCFC 12(b)(1) Motion to Dismiss

The court's "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion." Palmer v. United States, 168 F.3d 1310, 1313 (Fed. Cir. 1999). When considering a motion raised under RCFC 12(b)(1), the burden of establishing the court's subject matter jurisdiction resides with the party seeking to invoke it. See McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936). The plaintiff "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). The court must accept as true the allegations in the plaintiff's complaint and must construe such facts in the light most favorable to the plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982); Reynolds, 846 F.2d at 747. If the defendant or the court questions jurisdiction, the plaintiff cannot rely solely on allegations in the complaint but must bring forth relevant, adequate proof to establish jurisdiction. See McNutt, 298 U.S. at 189. In deliberating on a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to decide any factual disputes. See Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999); Reynolds, 846 F.2d at 747. If the court finds that it lacks subject matter jurisdiction, then it must dismiss the claim. RCFC 12(h)(3).

**B. Bid Protests**

The Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1) (2012), and may "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs," id. § 1491(b)(2). Interested parties are those "prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001).

Judicial review of agency actions in bid protest cases is limited to the administrative record. The court determines whether the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law based solely upon the administrative record. 28 U.S.C. § 1491(b)(1), (4); 5 U.S.C. § 702, 706(2)(A); see also Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

When reviewing agency action alleged to be arbitrary or capricious or an abuse of discretion, the court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." Sys. Application & Tech., Inc. v. United States, 100 Fed. Cl. 687, 711 (2011) (quoting and citing Impresa, 238 F.3d at 1332-33) (citations omitted and quotation marks). An agency's decision lacks a rational basis if the contracting officer "entirely failed to consider an important aspect of the problem, offered an explanation for [his] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). A disappointed bidder bears a heavy burden of showing that an agency's decision lacked a rational basis. Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004).

The rational basis standard of review is highly deferential. See PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010). The agency decision is entitled to a presumption of regularity, and the court should not substitute its judgment for that of the agency. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971); Great Lakes Dredge & Dock Co. v. United States, 60 Fed. Cl. 350, 359 (2004). When a disappointed bidder alleges contravention of law, it must show "a clear and prejudicial violation of applicable statutes or regulations." Impresa, 238 F.3d at 1333 (citations omitted and quotation marks). Moreover, the plaintiff must make a nonfrivolous allegation that the agency's actions violate a statute or regulation. 28 U.S.C. § 1491(b)(1); Distributed Solutions, Inc. v. United States, 539 F.3d 1340, 1345 n.1 (Fed. Cir. 2008) ("A non-frivolous allegation of a statutory or regulatory violation in connection with a procurement or proposed procurement is sufficient to establish jurisdiction."). The violation must be "rooted in a specific statute or regulation," not merely an allegation that the agency has acted arbitrarily or irrationally. Data Monitor Sys., Inc. v. United States, 74 Fed. Cl. 66, 73 (2006). Moreover, even if the protester can demonstrate errors in the procurement process, the protester must also show that it was "significantly prejudiced" by those errors. Bannum, Inc. v. United States, 404 F.3d 1346, 1357 (Fed. Cir. 2005). The postaward bid protest "substantial chance" test "envisions a review of the contract award or bid evaluation

process to determine what might have occurred if the government had not erred." Weeks Marine, Inc. v. United States, 79 Fed. Cl. 22, 35 (2007) (internal quotations omitted), aff'd in relevant part, 575 F.3d 1352 (Fed. Cir. 2009).

## C. Standing

Standing constitutes a "threshold requirement in every federal action." Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002). As an "indispensable part of the plaintiff's case," Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992), standing is "not a mere pleading requirement," Night Vision Corp. v. United States, 68 Fed. Cl. 368, 391 (2005). "[T]he question of standing," the United States Supreme Court explained, "is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975). Standing must be determined "as of the commencement of suit." Rothe Dev. Corp. v. Dep't of Def., 413 F.3d 1327, 1334 (Fed. Cir. 2005).

"[T]he plaintiff in a bid protest must show that it has standing to bring the suit." L-3 Global Commc'ns Solutions, Inc. v. United States, 82 Fed. Cl. 604, 608 (2008) (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003)). Although the Court of Federal Claims, an Article I court, "applies the same standing requirements enforced by other federal courts created under Article III," Anderson v. United States, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003), the United States Court of Appeals for the Federal Circuit ("Federal Circuit") has determined that 28 U.S.C. § 1491(b) "imposes more stringent standing requirements than Article III," Weeks Marine, 575 F.3d at 1359.

"The pivotal element of standing in a bid protest is whether a protestor qualifies as an 'interested party' under [section] 1491(b)(1)." RhinoCorps Ltd. v. United States, 87 Fed. Cl. 481, 485 (2009). The Federal Circuit has construed the term "interested party" as synonymous with the term "interested party" defined in the Competition in Contracting Act ("CICA"), Pub. L. No. 98-369, 98 Stat. 494 (1984), and now codified at 41 U.S.C. § 3304(a)-(c) (Supp. V 2012).[3] See Am. Fed. of Gov't Emps., 258 F.3d at 1302. In order to have standing as an "interested party," a protester must satisfy a two-part test. First, the protester must demonstrate that it is an actual or prospective bidder. Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006); see also MCI Telecomm. Corp. v. United States, 878 F.2d 362, 365 (Fed. Cir. 1989) (noting that "one who has not actually submitted an offer must be expecting to submit an offer prior to the closing date of the solicitation"). Second, the protester must demonstrate that it has a direct economic interest in the procurement. Rex Serv. Corp., 448 F.3d at 1307.

In order to establish a direct economic interest in the procurement, a protester must demonstrate prejudice. See Info. Tech., 316 F.3d at 1319 ("To establish prejudice, [a protester] must show that there was a 'substantial chance' it would have received the contract but for the alleged error in the procurement process."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 283

---

[3] CICA defines the term "interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2)(A) (2006).

(2006) ("[A] successful protestor must also establish that the errors complained of caused prejudice."). Therefore, "prejudice (or injury) is a necessary element of standing." Myers, 275 F.3d at 1370; accord Info. Tech., 316 F.3d at 1319; see also Media Techs. Licensing, LLC v. Upper Deck Co., 334 F.3d 1366, 1370 (Fed. Cir. 2003) ("Because standing is jurisdictional, lack of standing precludes a ruling on the merits."). "It is basic that 'because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.'"[4] Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378 (Fed. Cir. 2009) (quoting Info. Tech., 316 F.3d at 1319).

A protester's burden of establishing standing differs depending upon the nature of the protest. In postaward bid protests, a protester must show that it had a "substantial chance" of receiving the contract. Rex Serv. Corp., 448 F.3d at 1308. In other words, "[t]o have standing, the plaintiff need only establish that it 'could compete for the contract' . . . ." Myers, 275 F.3d at 1370 (quoting Impresa, 238 F.3d at 1334). Since plaintiff in this case has filed a postaward protest, it must demonstrate prejudice under the "substantial chance" standard.

## D. Standard for Judgment Upon the Administrative Record

Pursuant to RCFC 52.1, this court reviews the agency's procurement decisions to determine whether they are supported by the already-existing administrative record. The standards applicable to a motion for judgment upon the administrative record differ from those applied in the context of an RCFC 56 motion for summary judgment. Bannum, 404 F.3d at 1355- 56. Unlike an RCFC 56 motion, "proceeding under RCFC [52.1] merely restricts the evidence to the agency record . . . ." Id. at 1356. "Thus, the central inquiry on a motion for summary judgment–whether the movant has proved its case as a matter of fact and law or whether a genuine issue of material fact precludes summary judgment–has no bearing on a review of the administrative record . . . ." Tech Sys. v. United States, 50 Fed. Cl. 216, 222 (2001); accord Bannum, 404 F.3d at 1356 (holding that RCFC 52.1 requires a different standard of review without the burden-shifting and presumptions required pursuant to RCFC 56). In reviewing cross-motions for judgment on the administrative record, the court must determine "whether, given all the disputed and undisputed facts, a party has met its burden of proof based

---

[4] A protester must also demonstrate prejudice to succeed on the merits. See Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it."). The test for demonstrating prejudice at both the standing and merits stages of the protest is the same, but application of the test may yield different results due to the differing standards of review. See L-3 Commc'ns Corp. v. United States, 99 Fed. Cl. 283, 289 (2011) ("The difference between the two [prejudice standards] is that the prejudice determination for purposes of standing assumes all non-frivolous allegations to be true, whereas the post-merits prejudice determination is based only on those allegations which have been proven true."); Tech Sys., Inc. v. United States, 98 Fed. Cl. 228, 244 (2011) ("[S]ince, for purposes of standing, prejudice must be analyzed before a merits determination is made, it is more properly considered as a question of potential rather than actual prejudice, and assessed based on the cumulative impact of the well-pled allegations of agency error (which are assumed true at this juncture of proceedings).").

- 15 -

on the evidence in the record." A & D Fire Prot. v. United States, 72 Fed. Cl. 126, 131 (2006). In a manner "akin to an expedited trial on the paper record," the court will make findings of fact where necessary. CHE Consulting, Inc. v. United States, 78 Fed. Cl. 380, 387 (2007).

## IV.  DISCUSSION

### A.  Preliminary Matters

#### 1.  Standing

Defendant asserts that CWT cannot demonstrate that but for the errors it alleges the government made in the procurement, it had a substantial chance of receiving an award. Defendant argues that because CWT's FPR received a Marginal rating, which was assigned when a proposal did "not meet Government requirements necessary for acceptable contract performance," CWT was ineligible for an award. Further, it asserts that because CWT cannot show that its Marginal rating was arbitrary or capricious, CWT cannot demonstrate that it had a substantial chance of receiving the award. Finally, with respect to FAR 16.504(c)(1)(ii)(D)(1)(iii), the government argues that CWT cannot show that it was qualified and capable of performing the work at a reasonable price because the government found that CWT's price was not reasonable. Thus, defendant asserts that even assuming that everything CWT raises in its protest is true, CWT lacks standing to challenge the procurement because it cannot demonstrate that it is eligible for an award.

In response, CWT argues that defendant's position on standing is misguided, and the standing inquiry is made at the threshold of the merits inquiry. CWT asserts that defendant effectively cites its original reason for not awarding a second contract to CWT as a basis to claim that CWT does not have a chance of receiving a contract. It argues that GSA was required by FAR 16.504(c)(1)(ii)(D) to award CWT a second contract because CWT is in fact qualified and capable of correcting the weaknesses and performing the ETS2 task orders. Thus, if CWT wins on the merits, CWT not only has a substantial chance of receiving a contract, but would be guaranteed to receive a contract.

As explained above, a plaintiff can establish standing by proving that it suffered prejudice, or, in other words, that it had a substantial chance of receiving the contract, but for the alleged procurement error. A plaintiff with a substantial chance of winning the contract has a direct economic interest in the procurement, and has standing before this court. See Rex, 448 F.3d at 1307-08 (citing Myers, 275 F.3d at 1369-70).

The court finds that CWT has standing. CWT contends that GSA violated procurement law by awarding only one IDIQ contract to Concur despite the fact that GSA was required by FAR 16.504(c)(1)(ii)(D) to award a contract to CWT because CWT is qualified and capable of performing the ETS2 task orders. More specifically, CWT asserts that the government did not find that CWT was not qualified and capable of performing the work, but rather conducted a best value analysis in deciding to make one award.

Defendant argues that like the plaintiff in <u>Joint Venture of Comint Sys. Corp. v. United States</u>, 102 Fed. Cl. 235, 252 (2011), <u>aff'd</u>, 700 F.3d 1377 (Fed. Cir. 2012), the propriety of the Marginal rating assigned to CWT by the agency is determinative of both CWT's standing and the merits. The facts in <u>Comint</u>, however, are markedly different than those here. In <u>Comint</u>, this court determined that the plaintiff did not have standing, in part because the plaintiff received a Marginal rating, which was the second lowest rating, under the most heavily weighted factor Quality/Capability, while eight other offerors received higher factor ratings. 102 Fed. Cl. at 252. In fact, this court noted that the plaintiff was ranked, at best, ninth based upon its rating under this factor. <u>Id.</u> Moreover, the plaintiff had not challenged the evaluation of the other offerors. <u>Id.</u> As a result, the plaintiff could not show that it was in contention for an award.

Contrary to defendant's position, the facts here are different than those in <u>Comint</u>. While CWT received a Marginal rating, as the plaintiff in <u>Comint</u> did, that is not determinative here. Here, CWT alleges several instances in which its proposal was treated unequally in relation to Concur's proposal, and CWT asserts that if GSA had evaluated its proposal equally by allowing CWT to correct issues after award, as it allowed Concur to do, GSA could not have reasonably concluded that only Concur was capable of performing the contract. Moreover, the RFP allowed for two awards, and there were only two offerors; thus, the agency could have awarded a contract to CWT as well as to Concur. In sum, if everything CWT alleges in its protest is true, CWT would have a substantial chance of receiving a contract. Thus, the court declines to dismiss the protest on standing grounds.

## 2. Timeliness

Concur asserts that CWT's challenge against a single award is untimely because CWT did not protest before the proposal due date given that the RFP terms provided for the possibility of a single award. For support, Concur cites <u>Blue & Gold Fleet, L.P. v. United States</u>, 492 F.3d 1308 (Fed. Cir. 2007), and <u>Weeks Marine</u>, 575 F.3d 1352. CWT asserts that since Concur did not file a motion to dismiss, the court should disregard Concur's arguments. Nevertheless, even if the court does consider Concur's timeliness argument, CWT contends that its protest is not barred by the waiver rule of <u>Blue & Gold Fleet</u>, 492 F.3d 1308, which established that a protester waives its right to challenge an impropriety in a solicitation if it does not protest prior to the proposal submission deadline. CWT asserts that it could not have protested GSA's determination that Concur was the only qualified and capable source prior to the due date for proposals because GSA did not make that determination until after the evaluation of proposals. Further, CWT argues that it could not know that GSA would violate FAR 16.504(c)(1)(ii)(D) until receiving notice that GSA had awarded a single IDIQ contract to Concur.

The court finds that CWT's protest is timely, and it would have been premature for CWT to file a preaward protest on the grounds it has raised here. First, the RFP included FAR 52.216-27, Single or Multiple Awards, which is a standard clause required by FAR 16.506(f) to be included in all IDIQ solicitations when more than one award is possible. Tab 2 at AR 601. FAR 16.506(f) instructs agencies to "[i]nsert the provision at 52.216-27, Single or Multiple Awards, in solicitations for indefinite-quantity contracts that may result in multiple contract awards." The mere fact that the RFP included FAR 52.216-27 did not require CWT to file a preaward challenge under <u>Blue & Gold</u>, 492 F.3d 1308. Reserving the right to make one award authorized

- 17 -

GSA to do so assuming all other legal requirements were met. In order to make only one award, GSA still had to comply with FAR 16.504(c)(1)(ii)(D), which allows a single award if there is only one qualified and capable source. CWT had no competitive injury sufficient to file a preaward protest. Therefore, CWT had no basis to challenge the terms of the RFP before the proposal submission deadline, and the court declines to dismiss the protest on timeliness grounds.

### 3. Motions to Strike

Before turning to the merits of the cross-motions for judgment upon the administrative record, the court must also address the parties' motions to strike declarations that were filed by CWT and defendant. For the reasons explained below, the court denies the motions to strike.

### a) Legal Standard

Under RCFC 52.1, which governs the scope of the court's review on motions for judgment upon the administrative record, the court must make "factual findings under RCFC 52.1 from the [limited] record evidence as if it were conducting a trial on the record." Bannum, 404 F.3d at 1357. The purpose of this limited scope of review is to ensure that the court "exercise[s] restraint in examining information that was not available to the agency. A failure to do so risks converting arbitrary and capricious review into a subtle form of de novo review." Arinc Eng'g Servs., LLC v. United States, 77 Fed. Cl. 196, 200-01 (2007). "The task of the reviewing court is to apply the appropriate [Administrative Procedure Act ("APA")] standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." Florida Power & Light v. Lorion, 470 U.S. 729, 743-44 (1985) (citing Citizens to Preserve Overton Park, 401 U.S. 402). Therefore, in a bid protest, judicial review is generally limited to "the administrative record already in existence, not some new record made initially in the reviewing court." Axiom Res. Mgmt, Inc. v. United States, 564 F.3d 1374, 1379 (Fed. Cir. 2009).

According to Federal Circuit precedent, the prohibition against extra-record evidence applies when such statements are presented in declarations. The Federal Circuit in Axiom, in reversing the Court of Federal Claims, held that "the trial court abused its discretion in this case by adding Axiom's documents to the record without evaluating whether the record before the agency was sufficient to permit meaningful judicial review." 564 F.3d at 1380. The Court of Federal Claims' review should be focused upon "the administrative record already in existence, not some new record made initially in the reviewing court." Id. at 1379. The Federal Circuit held therefore that "supplementation of the record should be limited to cases in which the omission of extra-record evidence precludes effective judicial review" and the Court of Federal Claims must decide "whether supplementation of the record [is] necessary in order not to frustrate effective judicial review." Id. at 1381 (quotations omitted).

However, apart from evidence intended to supplement the administrative record, there are evidentiary submissions filed in support of the prospective relief sought. These submissions relate to an issue wholly within the court's purview. PlanetSpace, Inc. v. United States, 90 Fed. Cl. 1, 5 (2009). Accordingly, "[i]t is the responsibility of this [c]ourt, not the administrative agency, to provide for factual proceedings directed toward, and to find facts relevant to,

- 18 -

irreparability of harms or prejudice to any party or to the public interest through grant or denial of injunctive relief." PGBA, LLC v. United States, 60 Fed. Cl. 567, 568 n.1 (2004). "The limited scope of the court's APA review and the cautionary note of Axiom address this court's examination of the reasonableness of the challenged agency action. Evidence respecting relief, however, rests on a separate and distinct footing." PlanetSpace, 90 Fed. Cl. at 5. Such evidence "necessarily would not be before an agency decision-maker effecting a procurement decision such as a source selection award, . . . but would necessarily post date and flow from such agency decision." AshBritt, Inc. v. United States, 87 Fed. Cl. 344, 367 (2009). Accordingly, such evidence is admitted, not as a supplement to the administrative record, but as part of this court's record. Id.

### b) Summary of the Declarations at Issue in the Motions to Strike

With its cross-motion, defendant submitted a declaration from Mr. Martinez, the contracting officer for the ETS2 procurement who has been detailed to another division within GSA, but remains involved in the ETS2 procurement for purposes of CWT's protest. Martinez Decl. ¶ 1. In his declaration, under the subheading "Harm to Government Should Court Award to CWT," Mr. Martinez states that "not only did CWT not satisfy the basic mandatory requirements of the request for proposals (RFP) prior to contract award, but CWT still has not satisfied all of the mandatory RFP requirements. It remains technically unacceptable today." Id. ¶ 3. Mr. Martinez goes on to state that since the submission of FPRs, CWT has implemented six software releases for its ETS1 system, E2 Solutions, but these releases have failed to satisfy all of the ETS2 mandatory requirements. Id. ¶ 8. In particular, he asserts that CWT "did not indicate which of the 99 outstanding requirements were allegedly being met, if any at all. However, based on the six software releases for CWT's ETS1 system, described above, the agency has determined that only 11 of the 99 outstanding requirements may have been met in E2." Id. ¶ 9 (emphases omitted). Mr. Martinez concludes that if the court were to direct an award to CWT today, the government would be "at risk of not receiving many mandatory requirements or waiting another prolonged and unknowable period before CWT delivers the requirements, the agency tests the requirements, and the requirements are deemed acceptable." Id.

With its opposition to defendant's cross-motion, CWT filed Mr. McCauley's declaration. In his declaration, Mr. McCauley states that in his role, he "review[s] the development and execution of [CWT's] annual Product Management Plans including the release management decisions associated with E2 Solutions functional releases." McCauley Decl. ¶ 2. Mr. McCauley states that consistent with the responses to CWT's weaknesses and deficiencies identified during the IV&V process, CWT "successfully executed a development plan to deliver the remaining ETS-2 functional requirements . . . in November 2012." Id. ¶ 5. The declaration then states that CWT's "focus has been to deliver E2 Solutions functionality to a demonstration environment to fulfill the commitments expressed in our IV&V responses to GSA . . . [which] was accomplished in November 2012 as promised and GSA may commence testing at any time."[5] Id. ¶ 7.

---

[5] With its opposition to defendant's cross-motion for judgment upon the administrative record, CWT also submitted a declaration from Jim Hotze, the Vice President and Chief

- 19 -

### c) Mr. Martinez's Declaration

CWT argues that if the court strikes Mr. McCauley's declaration, then, under the same analysis, the court must also strike Mr. Martinez's declaration. CWT asserts that Mr. Martinez's declaration lacks credibility and is false, but states that it did not file a motion to strike at the time this declaration was offered because defendant was relying upon this declaration to support its opposition to the injunction, rather than to support its merits argument under RCFC 52.1. Further, CWT asserts that Mr. Martinez does not have any actual knowledge that the outstanding items in CWT's system are "still" not ready for testing, but rather that he is speculating that "CWT <u>may</u> have incorporated only 11 out of 99 ETS2 requirements." Pl.'s Mot. Strike 2 (quoting Martinez Decl. ¶ 15). Defendant correctly observes that a declaration that speaks to injury can be considered by the court. Moreover, defendant asserts that as the contracting officer at the time, Mr. Martinez was privy to the ETS2 retest results and had "actual knowledge" of these failures, and even though he is no longer the contracting officer, Mr. Martinez is kept apprised of contract issues impacting ETS1 in his current role, including CWT's additional software releases for its ETS1 system, E2 Solutions.

The court finds it appropriate to consider the declaration submitted by Mr. Martinez because it speaks to the alleged harm that the government will suffer if forced either to award a second contract to CWT or to reevaluate CWT's technical acceptability. <u>See</u> <u>PlanetSpace</u>, 90 Fed. Cl. at 5; <u>AshBritt</u>, 87 Fed. Cl. at 366-67.

### d) Mr. McCauley's Declaration

Defendant asserts that because Mr. McCauley's declaration did not exist and was not before the government at the time it was conducting the evaluation, GSA obviously could not have considered it when evaluating CWT's FPR, and as a result, the declaration is irrelevant to the court's review of GSA's ETS2 proposal evaluations and award determination. Moreover, defendant argues that Mr. McCauley's declaration is unnecessary for effective judicial review because the record in this case is exhaustive, and "CWT's effort to introduce extraneous information into this proceeding, without first demonstrating that the existing record somehow does not permit 'meaningful review,' is contrary to law." Def.'s Mot. to Strike 7. Defendant notes that CWT cites to Mr. McCauley's declaration only once, and to support the statement that it "'has continued to develop its ETS2 system to satisfy all the RFP requirements. CWT has been ready to demonstrate correction of the 99 weaknesses since the last week of November

---

Financial Officer of CWT. In his declaration, Mr. Hotze states that he has knowledge of the various costs and expenditures incurred by the protester in developing ETS1 and ETS2. Hotze Decl. ¶ 5. He states that since March 2003, CWT has incurred costs in excess of $[ . . . ] for ETS1 and $[ . . . ] for ETS2, and that there is a risk that [ . . . ] full-time equivalent employees would lose their jobs if CWT is not awarded a ETS2 contract. <u>Id.</u> ¶¶ 7-8. Neither defendant nor Concur object to the court's consideration of Mr. Hotze's declaration because that declaration speaks solely to CWT's alleged irreparable harm. The Court of Federal Claims has previously considered declarations that speak to prejudice and injunctive relief, deeming them part of the record before the court. <u>See</u> <u>PlanetSpace</u>, 90 Fed. Cl. at 5; <u>AshBritt</u>, 87 Fed. Cl. at 366-67. Therefore, the court finds it appropriate to consider this declaration.

2012.'" Id. (quoting CWT Opp'n 37). In other words, defendant argues that Mr. McCauley is attempting to testify, through his declaration, that CWT is "qualified and capable of performing the work" under FAR 16.504(c)(1)(ii)(D)(1). Id. at 7-8. Whether CWT is ready to perform now, defendant contends, is irrelevant to the merits of this bid protest.[6] Id. at 8.

CWT asserts that since it is not relying on Mr. McCauley's declaration for RCFC 52.1 judgment, the Axiom principles are inapplicable. CWT states that it submitted Mr. McCauley's declaration for the sole purpose of countering Mr. Martinez's allegations, and CWT only cites to Mr. McCauley's declaration once in support of its request for injunctive relief. Because Mr. McCauley's declaration counters the harm that the government alleges it will suffer if forced either to award a second contract to CWT or to reevaluate CWT's technical acceptability, the court finds it appropriate to consider this declaration. See PlanetSpace, 90 Fed. Cl. at 5; AshBritt, 87 Fed. Cl. at 366-67.

### e) Portions of Defendant's Reply Brief

CWT also moves to strike the portions of defendant's reply brief that purportedly contain an argument that is both outside of the administrative record and was never raised in prior briefing. In particular, CWT contends that defendant argues in its reply brief that CWT's price was deemed unreasonable even though the contemporaneous record reflects that GSA found all proposals to be reasonably priced. Further, citing case law, CWT argues that the court should also strike defendant's that CWT's price was deemed unreasonable because it was presented for the first time in a reply brief.

Defendant contends that CWT is focusing on the wrong evaluation, and that CWT's "total price" (i.e., for CLINs 1-5 and their associated option CLINs) was evaluated and determined to be unreasonable. Moreover, defendant asserts that in its opening brief, it pointed out that CWT's price was unreasonable and relied upon this finding in making its arguments. Lastly, defendant argues that even if the court concludes that defendant did raise the price reasonableness argument in its reply brief for the first time, the court should not consider the issue waived because CWT is not prejudiced. Rather, defendant states that CWT has had the opportunity to respond to this argument in its own motion to strike and at oral argument. Defendant further notes that the waiver rule to which CWT cites is rooted in "concepts of fair notice and prejudice." Def.'s Reply to Mot. to Strike 12.

The court finds no basis to strike these portions of defendant's reply brief. Defendant, in its moving brief, did state that the evaluators "considered CWT's single award price to be unreasonable compared to Concur Proposal B's single award price." Def.'s Cross-Mot. at 44. Further, the price analysis consensus report reflects that the Price Evaluation Board "consider[ed] [CWT's] Single Award price of $1,427,876,623 to be unreasonable compared to the lowest competitive offer [submitted by Concur]. [CWT's] Dual Award price of

---

[6] Concur similarly argues that the existing record is more than sufficient to permit meaningful review. Citing Axiom, 564 F.3d at 1379, Concur further asserts that the court should only consider evidence that is already part of the record, instead of considering the McCauley declaration, which was created for use before this court.

$1,562,846,138 [is considered] to be unreasonable compared to the lowest competitive offer [submitted by Concur]." Tab 122 at AR 7478. Therefore, the court will not strike these arguments from defendant's reply brief.

**B. Arguments on the Merits**

**1. CWT Argues That GSA's Decision to Make a Single Award Violated FAR 16.504(c)'s Prohibition Against Awarding an IDIQ Contract Over $103 Million to a Single Source**

Although the FAR establishes a general discretionary "preference" for multiple IDIQ awards, FAR 16.504(c)(1)(ii)(D) permits the award of an IDIQ contract to a single source when the procurement is valued in excess of $103 million and one of a limited number of exceptions is present. CWT argues that no exception to the multiple-award mandate is present. The government, however, asserts that because Concur was the only qualified and capable source, the exception at FAR 16.504(c)(1)(ii)(D)(iii) applies. For the reasons discussed below, the court holds that the government's award decision was not consistent with FAR 16.504(c)(1)(ii)(D).

**a) FAR 16.504, Indefinite-Quantity Contracts**

Under FAR 16.504(c)(1)(i), the contracting officer "must, to the maximum extent practicable, give preference to making multiple awards of indefinite-quantity contracts under a single solicitation for the same or similar supplies or services to two or more sources." The contracting officer should consider the following when determining the number of contracts to be awarded:

> (1) The scope and complexity of the contract requirement.
> (2) The expected duration and frequency of task or delivery orders.
> (3) The mix of resources a contractor must have to perform expected task or delivery order requirements.
> (4) The ability to maintain competition among the awardees throughout the contracts' period of performance.

FAR 16.504(c)(1)(ii)(A). However:

> (1) No task or delivery order contract in an amount estimated to exceed $103 million (including all options) may be awarded to a single source unless the head of the agency determines in writing that—
> . . . .
>
> (iii) Only one source is qualified and capable of performing the work at a reasonable price to the Government.

FAR 16.504(c)(1)(ii)(D). Plaintiff cites to this provision in support of its argument, discussed below, that the government did not determine that CWT was not qualified and capable of performing the work at a reasonable price.

- 22 -

## b) The Parties' Arguments

CWT contends that GSA's decision to award only one contract violated FAR 16.504(c), which prohibits an agency from awarding a major IDIQ contract to a single source, because Concur is not the only source qualified and capable of performing the work at a reasonable price. CWT asserts that GSA misunderstood FAR 16.504(c)(1)(ii)(D) when it evaluated proposals and selected Concur for a single award because GSA mistakenly believed that a dual award was only a "preference." For instance, CWT points to the acquisition plan in which GSA stated that there is a "strong preference for choice among providers . . . and for multiple awards." Tab 118 at AR 6576. Further, CWT argues that GSA's decision to follow FAR 16.504(c)(1)(ii)(A) was unlawful because FAR 16.504(c)(1)(ii)(D) clearly states that "[n]o task or delivery order contract in an amount estimated to exceed $103 million (excluding options) may be awarded to a single source unless the head of the agency determines in writing" that one of the specific narrow exceptions is present, including that there is only "one qualified and capable source."

CWT argues that while its proposal contained weaknesses, its proposal did not fail to conform to the material terms and conditions of the RFP. It claims that the only issue that led to its Marginal rating was that its proposal did not adequately demonstrate that its system had finalized all of the outstanding items. CWT argues that none of the case law cited by GSA or Concur pertaining to "unacceptable" proposals is applicable to this protest because those cases do not involve FAR 16.504(c)(1)(ii)(D). CWT asserts that because the government admits that it did not make any finding that CWT was not qualified and capable of performing the work, this protest should be sustained because FAR 16.504(c)(1)(ii)(D) requires the government to issue a valid determination that "[o]nly one source is qualified and capable of performing the work" in order to legally authorize the award of only one master IDIQ contract.

The government argues in response that it did not make a finding of whether CWT, as a company, was qualified and capable of performing the work, but the government did find that CWT's FPR did not meet government requirements. Further, defendant notes that CWT corrected some, but not all, of the significant weaknesses and chose not to correct its deficiency. As a result, defendant argues that CWT's FPR did not meet the RFP requirements, "which was consistent with a rating of 'Marginal' and, therefore, was not technically acceptable." Cross-Mot. at 40. Defendant contends that because CWT's proposal was not technically acceptable, GSA could not award CWT an ETS2 contract as such an award would violate the procurement statutes and regulations and would place significant risk upon the government that the awardee may not be able to perform the contract. Moreover, defendant points out that the SSAC did conclude that CWT is not "currently qualified." Tab 103 at AR 5301.

## c) GSA Did Not Satisfy FAR 16.504(c)(1)(ii)(D)(1)(iii)

As discussed above, FAR 16.504(c)(1)(ii)(D) permitted GSA to award one IDIQ contract valued at greater than $103 million where there is only one source qualified and capable of performing the work. This bid protest appears to be a case of first impression since there are no reported decisions addressing this FAR exception.

Here, instead of discussing in the D&F whether CWT was qualified and capable of performing the ETS2 work, the government's D&F arrives at the conclusion that Concur is the

only qualified and capable source because CWT received an overall rating of Marginal. That is, the government essentially conducted a best value tradeoff, which was inappropriate for purposes of FAR 16.504(c)(1)(ii)(D)(1)(iii). In the D&F, the government compares the relative strengths and weaknesses in the offerors' proposals under the RFP's evaluation criteria and total prices, as well as the perceived general risks and benefits of a single versus dual award. Thus, GSA selected Concur on a best value basis, which was inconsistent with what FAR 16.504(c)(1)(ii)(D) required. Moreover, the assignment of a Marginal rating to CWT meant that its proposal did not "meet Government requirements necessary for acceptable contract performance, but <u>issues are correctable</u>." Tab 2 at AR 767, 774 (emphasis added). The government points to the D&F, in which the contracting officer stated that CWT was found "not technically acceptable for contract award." Tab 104 at AR 5405. Nonetheless, the government assigned CWT a Marginal rating, which was not consistent with a finding that CWT, either the company or its FPR, was not qualified and capable of performing the ETS2 work at a reasonable price, but rather was a finding that CWT's proposal did not meet "[g]overnment requirements necessary for acceptable contract performance, but issues are correctable." Tab 2 at AR 767, 774. A Marginal rating was different from an Unacceptable rating, which would be assigned where the proposal contained "numerous weaknesses and/or deficiencies, or contains weaknesses and/or deficiencies that are not correctable," and the government determined that the offeror would be "unable to successfully complete the required tasking." <u>Id.</u>

Moreover, the contemporaneous record appears to conflict with any alleged determination that CWT is not qualified and capable of performing the work. CWT was awarded a strength because "[t]he experience and capabilities of the E2 Solutions team, with CWTSatoTravel as the prime, and Northrop Grumman Corporation (NGC), . . . are unmatched by any other potential Offeror." Tab 121 at AR 7240. While CWT received this strength under the past performance factor, the government did state that the CWT team's "experience and capabilities" are unmatched by any other potential offeror. Therefore, the government was not speaking simply of CWT's past capabilities. The government gave CWT an Acceptable rating under the past performance factor because CWT's "proposal meets the performance and technical capability requirements defined in the [Statement of Work]. The SSEB is confident that the Offeror can successfully achieve the requirements in the [Statement of Work] if the technical approach proposed is followed." <u>Id.</u> at AR 7419. CWT also received the following strength under the technical factor, Project Management Plan:

> The Offeror states that "by combining CWTSatoTravel and NGC's resources, the client agencies currently serviced under NGC will have the expertise of resources currently servicing their account." The knowledge they have of their ETS1 clients will minimize the amount of time during the preparation phase and assist in the setup within the Offeror's ETS2 solution. This shows potential for reducing migration tasks or shortening the time to perform RFP requirements to meet goals and to minimize the disruption, costs, and time required to integrate agency systems to ETS2.

<u>Id.</u> at AR 7411.

With respect to the allegation that CWT is not qualified and capable of performing the work at a "reasonable price," the record here also is inconsistent. In the SSDD, the government states that CWT "was not competitive when compared" to Concur, and CWT's "price proposal was the highest priced offer." Tab 103 at AR 5295. Then, the SSDD reflects that the government performed a best value tradeoff analysis, stating "it is not reasonable to pay $231,326,712 more for a Marginal proposal with significant weaknesses and a security deficiency." Id. at AR 5296 (emphasis omitted). However, as stated above, it was improper to make a single award based on a best value tradeoff approach. The government additionally states that "some of CWTSatoTravel's price assumptions [were] reasonable, representing minimal risk to the Government," but "11 of 31 price assumptions represented cost and/or performance risk to a degree that was considered unreasonable as these assumptions could result in either a refusal to perform or delay in performance." Id. at AR 5297. However, the D&F reflects that the government only selected Concur for award because it had a higher rating and lower relative price, not because CWT's price was "unreasonable." See Tab 104 at AR 5406 ("The Government determines that Concur Technologies, Proposal B, is superior to CWTSatoTravel's proposal in overall technical merit and is lowest in evaluated price, representing less risk of performance issues at a more favorable price."). Finally, the SSDD reflects that the government believed that "[a]ll proposals had both reasonably and unreasonably priced CLINs, and "[w]hile a few of the prices for individual CLINs were determined to be unreasonable, the overall price offered was determined to be fair and reasonable for all three offers, despite the presence of these unreasonably priced CLINs." Tab 103 at AR 5288.

On the one hand, the RFP did require the agency to make a best value determination. On the other hand, the FAR nonetheless allowed the agency to award to a single offeror only upon determining that there is a single source that is qualified and capable of performing the work at a reasonable price. Here, the record demonstrates that the agency used a best value determination when it decided to award the contract to a single offeror. That is, the agency selected Concur because it was technically superior and priced lower than CWT. Such determination is inconsistent with FAR 16.504(c)(1)(ii)(D).

### 2. CWT Contends That GSA Engaged in Unequal Treatment

CWT next argues that GSA's award decision was the result of unequal treatment. Specifically, CWT contends that GSA did not require Concur to demonstrate compliance with all requirements before award, but required CWT to improve its offer by addressing the outstanding ninety-nine items prior to award, and when CWT did not, GSA used this as the primary reason to determine that Concur was the only source qualified and capable of performing the work. With respect to Concur, CWT asserts that GSA permitted Concur to address at least sixteen IV&V functional/usability factor weaknesses after contract award without deeming it unqualified or incapable of performing the work. In particular, CWT states that Concur promised to start studying the weaknesses, which were not insignificant, sixty days after award and then develop a plan to improve its ETS2 solution, but Concur did not commit to when or even if these weaknesses would actually be corrected. CWT also points out that Concur stated that it would correct a security weakness thirty days after award and before the agency goes live, and GSA apparently agreed that this was acceptable, but found that it was not acceptable for CWT to promise to correct all weaknesses a year before the agency goes live.

- 25 -

With respect to the GAO decision, CWT contends that while GAO properly recognized that GSA's response to CWT's unequal treatment claim was without merit, GAO improperly concluded that this GSA error was not prejudicial. CWT asserts that GAO's analysis that CWT did not suffer prejudice was flawed because this was not a best value decision where the agency makes a tradeoff to select the winner.

The government identified 186 "weaknesses, including those considered significant weaknesses, deficiencies, and comments concerning objectives not fully met, from the Government's Phase II evaluation which require[d] [Concur's] attention in preparation for negotiations." Tab 91 at AR 4961. Concur's FPR reflects that for sixteen of the 186, Concur stated that the government's comments would be "considered as outlined in section 4.0 of the PMP." Tab 120 at AR 7292-93, 7318-20, 7328-31. In Section 4.4 of Concur's Project Management Plan, Concur stated:

[ . . .]

Id. at AR 7058. Thus, Concur's plan merely consisted of a promise to start studying the weaknesses within sixty days after award and then develop a plan to improve its ETS2 solution.

The SSEB report includes the following reference to this issue: "Due to not re-testing usability, usability weakness comments previously evaluated remained as weaknesses." Tab 121 at AR 7368. The SSAC report does not appear to address the issue. However, with respect to CWT's approach to offering postaward testing, the SSAC/PAR shows that CWT was evaluated adversely under the IV&V functional/usability factor. See Tab 103 at AR 5386 ("Vendor has cited that [the feature/function] will be in the November 2012 update, but at present, this exposes the government to risk of contract underperformance via an unmet requirement. This is a SIGNIFICANT weakness." (emphasis omitted)).

In response, the government asserts that by CWT not even offering to address the ninety-nine requirements it failed to meet in its FPR, GSA could not evaluate them, but Concur offered the functionalities associated with the minor weaknesses in its FPR, and therefore, those functionalities could be evaluated. Next, the government states that the language CWT quotes from Concur's FPR as proof that GSA accepted Concur's postaward remediation plan while not accepting CWT's postaward remediation plans is misleading because the RFP requires ongoing usability improvements, which can only be made after award when users use the tool and can provide feedback. The government contends that, by contrast, CWT's postaward promises to remediate its significant weaknesses and deficiency were not acceptable because "they were not specific, failed to detail the resources or methodology [CWT] would use to resolve issues, and did not provide a schedule of what functionality would be available and when." Def.'s Reply 7.

This is an insufficient explanation for why the government considered Concur's proposed approach of postaward testing under this factor as acceptable, but the government viewed CWT's approach as a significant weakness. The government notes that Concur's proposal did not suffer from several significant weaknesses and a deficiency as CWT's did. It appears, however, that the government unfairly held CWT to the award date in finding CWT to be technically

unacceptable but did not do the same for Concur, and even allowed Concur to correct outstanding items postaward with a remediation plan that was not as specific as the government asserts in its briefing. The government contends that CWT did not address the ninety-nine outstanding requirements in its FPR, but even if in general terms, CWT agreed to comply with all RFP terms, including those ninety-nine requirements that were to be incorporated by November 2012. Tab 113 at AR 6091, 6095-97. Concur's FPR, as quoted above, does not appear to fare better, stating also that it would address the requirements after award, and the SSEB stated that it had reviewed "the remediation plan; however, it did not inspire the level of confidence in the board to remove the applicable weakness comments." Tab 121 at AR 7392. While both CWT and Concur responded to some of the concerns the government had with their proposals with plans to correct the weaknesses after award, GSA treated CWT and Concur unequally by rejecting CWT's postaward compliance date but accepting Concur's promises.

GAO determined that even if there was unequal treatment, such error was not prejudicial to CWT in this best value competition. However, in the context of FAR 16.504(c)(1)(ii)(D)(1)(iii), when the agency decided to make a single award and had to determine whether there was only a single source that was qualified and capable of performing the work at a reasonable price, such error could have impacted CWT's chance at obtaining an award.

### 3. CWT Contends That GSA Permitted Concur to Take Exception to Mandatory RFP Requirements and/or Qualify Its Promise to Meet RFP Requirements

It is well-established that a "contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 383 (2003), aff'd, 365 F.3d at 1345; see also Afghan Am. Army Servs. Corp. v. United States, 106 Fed. Cl. 714, 729 (Fed. Cl. 2012). "[U]neven treatment goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion." PGBA, LLC v. United States, 60 Fed. Cl. 196, 207 (2004), aff'd, 389 F.3d 1219 (Fed. Cir. 2004); see also TLT Constr. Corp. v. United States, 50 Fed. Cl. 212, 216 (2001) ("A fundamental principle of government procurement is that [the agency] treat all offerors equally and consistently apply the evaluation factors listed in the solicitation.").

CWT asserts that Concur took exceptions to certain RFP requirements and included conditions regarding the personnel, resources, and responsibilities that each agency customer must contribute for Concur to meet mandatory RFP requirements, but the government failed to evaluate the substantial risk and cost associated with these conditions. As a result of Concur's conditioned proposal commitments, CWT argues that Concur was not capable of performing 100% of the ETS2 requirements at the time of contract award. Therefore, CWT contends that GSA's determination that Concur is the only qualified and capable source was based on an arbitrary, irrational, and unequal evaluation. Finally, CWT asserts that Concur's "conditioned commitments are the substantive equivalent of pricing assumptions embedded within its technical proposal," and GSA failed to evaluate the significant costs and burdens that Concur's compliance plan imposes upon individual agencies and the implications of Concur's qualified commitment to perform. Pl.'s Mot. at 45.

### a) Accommodated Travel Management Centers ("ATMCs")

CWT asserts that GSA waived express RFP requirements regarding ATMCs by disregarding Concur's exception to the requirement that ETS2 contractors accommodate ATMCs at no additional cost to the ATMC. Section C.4.2.12, Accommodated Travel Management Centers, of the RFP states:

> Customer agencies may utilize [Travel Management Centers] other than Contractor's [Embedded Travel Management Centers] for ETS2 fulfillment and agent-assisted reservation services, including [Agent-Assisted Travel Reservation Service]. Accordingly, the Contractor shall be required to accommodate the services of ATMCs.
>
> The Contractor shall establish a cooperative relationship with each [Travel Management Center], including ATMCs, to ensure the Federal traveler experiences no degradation in travel service, consistent with the terms, conditions, and scope of the contract to be awarded hereunder . . . .

Tab 2 at AR 90. One of the mandatory requirements with respect to ATMCs was the following:

> The Contractor shall accommodate an ATMC at no expense to the ATMC or no additional cost beyond the transaction fee to the government in accordance with proposed expedited customer agency accommodation schemes to speed transaction utilization and growth.

Id. at AR 91.

In particular, CWT alleges that Concur stated that its ability to engage with an ATMC would depend on the ATMC's willingness to mitigate or absorb various costs that may be associated with using the particular ATMC, and that Concur insisted that all ATMCs bear the costs arising from the integration with its ETS2 system. The government argues that the ATMC requirement was intended to ensure that the contractor did not charge ATMCs ancillary fees over and above the reservation and fulfillment transaction fees paid by the government in the resulting contract, and both the government and Concur argue that the Concur proposal did not state that Concur would charge ATMCs.

For instance, Concur stated that its "[ . . .]." Tab 120 at AR 6912. It went on to say: "[ . . . ]." Id. Concur then stated that it would engage ATMCs if they would agree to business terms, including: "[ . . . ]." Id.

The RFP stated that an offeror was prohibited from charging a fee to the ATMC in order to accommodate the ATMC or from charging a fee to the government in addition to the awarded price, but an offeror did not have to accommodate or indemnify an ATMC for costs charged by the ATMC's third-party supplier. Thus, Concur did not state that it would charge ATMCs or the government fees, but rather, Concur discussed how it would handle fees that could be charged to

the ATMCs by third-party vendors. Concur stated that if the ATMC's third-party supplier charged certain fees in excess of what Concur would charge for the same service, the ATMC could select a different third-party supplier or absorb the additional fees.

CWT also argues that Concur shifted the costs of training to the ATMCs, and this is a price assumption that should have been included in its proposal. Concur stated: "[ . . . ]." Id. In other words, if Concur must provide training services to the government that include information specific to the ATMC, then the ATMC will bear the cost or pay Concur for that ATMC-specific content. This is not a price assumption that impacts what the government pays, and CWT has not pointed to any requirement in the RFP that mandates that an offeror train customers on an ATMC's specific information. Likewise, CWT asserts that Concur required the ATMC to absorb fees associated with Concur auditing and/or devising quality control routines for the ATMC. Here, too, there was no RFP requirement that Concur perform quality control on behalf of ATMCs who are under separate contracts to ordering agencies. The court finds no merit to any of these arguments raised by CWT.

### b) Integration With Customers' Business Systems

CWT next argues that Concur took exception to the RFP, section C.8, "Agency Business Systems Data Integration Capabilities and Characteristics," which states: "[G]oals for integration in ETS2 are to a) minimize the disruption, costs, and time required to integrate agency systems to ETS2 to the maximum extent possible, b) promote technologies that provide for the accurate and timely exchange of data in accordance with agency needs, and c) support easier adaptation later (should agencies need that)." Tab 2 at AR 149. CWT points to Concur's technical proposal, in which Concur states that it has "[ . . . ]." Tab 120 at AR 7062-63. Such language, CWT contends, required the government to provide specific and extensive personnel resources, in a way that violated the stated objective of minimizing costs and time to the customer agencies.

The court finds no merit to CWT's argument. The RFP required the contractor to coordinate with the customer agency regarding integrating agency systems and transition to ETS2. Clearly, agencies have to be involved in the integration and implementation process to ensure successful transition. Moreover, the RFP required offerors to clearly identify agency roles and responsibilities in the transition and implementation process. Tab 2 at AR 742; Tab 120 at AR 7062.

### c) Types of Travel

In section C.3.2.1, Mandatory Requirements, the government identified the following types of federal official travel that had to be addressed by a contractor's ETS2 system:

1) Temporary duty (TDY) travel, including foreign and domestic;
2) Local travel;
3) Long-term TDY, including foreign and domestic;
4) Blanket/Open Travel;
5) Group Travel;

6)       Invitational travel;

7)       Non-Federally Sponsored travel;

8)       Joint Federal Travel Regulation (JFTR) authorization and voucher entitlements for the U.S. Coast Guard (see Attachment 12, Joint Federal Travel Regulation (Separately Priced Mandatory Requirement)[)];

9)       Federal Emergency Management Administration (FEMA) Surge Blanket Travel (SBT), which requires an extremely large number of employees to be granted authority to travel under one travel authorization.  See Attachment 13, FEMA Surge Blanket Travel Requirements (Mandatory, Separately Priced), for more detail;

10)      U.S. Department of State (DoS) authorization and voucher requirements for dependents.  (See Attachment 19, Department of State Travel for additional guidance and 14 FAM 500 and 4 FAM 460 for specific requirements *(*Mandatory, Separately Priced)).  Entitlement computations including family members but excluding relocation are separately priced;

11)      Other special types of travel that are included in the as-determined-by-customer agency task order requirements.  These may include, but are not limited to the following;

        1)   Patient travel (Mandatory, Separately Priced); and

        2)   Entitlement travel for overseas Government employees including:

            a.   Educational travel for dependents overseas with employees, including JFTR[,] DoS, and U.S. Agency for International Development (USAID);

            b.   Medical evacuation, including JFTR, DoS, USAID;

            c.   Dependent patient travel, including JFTR, DoS, USAID;

            d.   Escort travel, including JFTR, DoS, USAID;

            e.   Attendant travel, including JFTR, DoS, USAID;

            f.   Ship-overhaul travel for JFTR;

            g.   Home leave, including JFTR, DoS, USAID;

            h.   Rest and Recuperation (R&R) travel, including JFTR, DoS, USAID; and

12)      Visitation travel for children of separated parents, including JFTR, DoS, USAID.

Tab 2 at AR 61.  The government also stated that it intended to test certain section C requirements during the IV&V phase, but reserved the right to adjust the requirements tested.  Id. at AR 722.  "Mandatory, separately priced requirements will not be tested during Phase II IV&V, but will be tested after award."  Id.  Of relevance here, the government identified requirements 1 through 7 and 11.2 of section C.3.2.1, Types of Travel, as those that it intended to test during the IV&V phase.  Id. at AR 722-23.  In other words, requirements 8 through 10, 11.1, and 12 were not marked as those that the government intended to test.

CWT argues that Concur qualified its promise to meet four mandatory section C.3.2.1 requirements, months after award, when it stated in its proposal that "'[f]our comprehensive mandatory requirements specified in the solicitation may require some additional work to fully support, as outlined below.'"  Pl.'s Mot. 44 (quoting Tab 120 at AR 7039).  In particular, CWT

cites to requirements 8 through 11 of section C.3.2.1 that described the types of federal official travel that the contractor's ETS2 had to support. Tab 2 at AR 61. The government and Concur state that the contracting officer noted that these requirements "were specifically excluded from the pre-award evaluations," (Def.'s Cross-Mot. 51 (quoting Tab 128 at AR 7661-62)), and the government notes that both Concur and CWT offered to develop these specific requirements that would apply only to specific agencies upon the award of a task order.

CWT's challenge has no merit. The RFP, section E.6.3.6.3, Mandatory Requirements Testable in IV&V, identified certain requirements that the government intended to test during the IV&V and other requirements that would "not be tested during Phase II IV&V, but [would] be tested after award." Tab 2 at AR 722. Requirements 8 through 10 of section C.3.2.1 were not identified as those that would be tested during IV&V. Id. at AR 723. Requirement 11 was divided into 11.1 and 11.2. Defendant, nonetheless, asserts that requirements 8 through 11 were not on the table. Requirement 11.1 was not on the table of requirements that the government would test during IV&V. Requirement 11.2, however, which required the contractor to support entitlement travel for overseas government employees, including educational travel and medical evacuation, was on the table of requirements that would be tested during IV&V. Id. Thus, it appears that the government intended to evaluate requirement 11.2 of section C.3.2.1 during IV&V. However, neither offeror appears to have been downgraded for not meeting this requirement during IV&V testing. Moreover, like Concur, CWT did not offer to provide these same requirements before award. Tab 113 at AR 5949, 6095. Thus, CWT cannot establish that its proposal was prejudiced.

### d) Section 508 Requirements

Third, CWT claims that Concur qualified its commitment to meet the RFP's mandatory "Section 508" requirements up to ninety days after contract award. Pl.'s Mot. 45 (referring to Tab 120 at AR 7257). The government notes that neither offeror met this requirement preaward. Rather, as the government notes, both offerors offered an acceptable remediation plan for this issue, and neither offerors' proposal was downgraded. Finally, Concur argues that it did not take exception to the Section 508 compliance requirement and the agency specifically noted during discussions that both Concur and CWT had weaknesses with their compliance.

This CWT challenge also lacks merit. Both offerors proposed postaward solutions to Section 508 compliance as permitted by the RFP. During discussions and in their FPRs, both offerors improved their proposals by offering remediation plans for how they would meet the Section 508 requirements. The government determined that both remediation plans were satisfactory regarding Section 508 compliance, and the record reflects that neither offeror was downgraded for its failure to provide full preaward Section 508 compliance. Tab 121 at AR 7396-98, 7427-28. CWT has not shown that it was treated differently than Concur, and it has not shown that it suffered prejudice.

### C. CWT Was Prejudiced

The Federal Circuit has held that "prejudice (or injury) is a necessary element of standing" in bid protests. Myers, 275 F.3d at 1370. To establish prejudice, CWT "must show

- 31 -

that it had a substantial chance of being awarded the contract but for the alleged violation of the procurement statute or regulation." Hamilton Sundstrand Power Sys. v. United States, 75 Fed. Cl. 512, 515 (2007). In other words, CWT's "chance of securing the award must not have been insubstantial." Info. Tech., 316 F.3d at 1319. When a protester asserts a violation of regulation or procedure, "the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" Impresa, 238 F.3d at 1333; Data Gen., 78 F.3d at 1562-63. As explained above, the government failed to follow FAR 16.504(c)(1)(ii)(D)(1)(iii) and treated the offerors unequally. As a result, CWT was significantly prejudiced by the government's actions. Further, the court gives no weight to the government's contention, made in the midst of litigation, that the agency would reach the same conclusion should the court find that the government violated the FAR.

## D. Injunctive Relief Is Appropriate

To obtain permanent injunctive relief, CWT must demonstrate: (1) success on the merits; (2) irreparable harm to CWT if the injunction is not granted; (3) the balance of hardships on all parties weighs in CWT's favor; and (4) that an injunction is in the public interest. See PGBA, 389 F.3d at 1228-29 (citations omitted). No single factor is determinative, and "the weakness of the showing regarding one factor may be overborn by the strength of the others."[7] FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993). CWT has demonstrated that GSA's determination that Concur was the only source qualified and capable of performing the work at a reasonable price and GSA's decision to award a single IDIQ contract were arbitrary and unlawful and, therefore, has satisfied the first element of success on the merits. As discussed below, the remaining three factors also weigh in CWT's favor.[8]

_____

[7] The government, citing Baird Corp. v. United States, 1 Cl. Ct. 662, 664 (1983), argues that CWT must establish an entitlement to injunctive relief by clear and convincing evidence. The court disagrees, and finds persuasive the analysis in Textron, 74 Fed. Cl. at 287, and Bannum, Inc. v. United States, 60 Fed. Cl. 718, 723-24 (2004), aff'd 404 F.3d at 1346. There is no binding precedent requiring this elevated burden of proof. See Bannum, 60 Fed. Cl. at 723. It is clear from a review of the relevant precedent that the preponderance of the evidence test should apply. See Career Training Concepts, Inc. v. United States, 83 Fed. Cl. 215, 218-19 (2008).

[8] In its complaint and motion for judgment upon the administrative record, CWT requests that the court "issue an injunction directing GSA to award a second IDIQ contract to CWT." Compl. at ¶ 9; Pl.'s Mot. 47. The court, however, lacks the authority to direct the award of a contract. As the Federal Circuit has held, the disappointed bidder has "'no right . . . to have the contract awarded to it in the event the . . . court finds illegality in the award of the contract . . . .'" CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1575 (Fed. Cir. 1983) (quoting Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859, 864 (D.C. Cir. 1970)). Rather, appropriate injunctive relief is where the court "enjoin[s] the illegal action and return[s] the contract award process to the status quo ante." Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994); see also Turner Constr. Co. v. United States, 645 F.3d 1377, 1388 (Fed. Cir. 2011) (same).

### 1. CWT Has Demonstrated Irreparable Harm

When assessing irreparable injury, "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction." Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 743 (2000) (citation omitted). The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract. See CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 390-91 (2010); Serco, Inc. v. United States, 81 Fed. Cl. 463, 501-02 (2008); Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 826, 828 (2002).

The facts here demonstrate that CWT will suffer irreparable harm if the court does not provide injunctive relief. The ETS2 IDIQ contract vehicle will provide over seventy individual federal civilian agencies with electronic travel management services, with up to a fifteen-year period of performance and an evaluated contract price exceeding $1.3 billion. CWT asserts that in the absence of an injunction, Concur will possibly have a fifteen-year monopoly over electronic travel management services for these federal civilian agencies, "effectively shutting CWT out of this market for good." Pl.'s Mot. 47. CWT also asserts that it would likely be forced to lay off [ . . .] employees.

The government and Concur argue that economic harm only is insufficient to meet this prong of the four-factor test. However, the cases cited in support of this argument are inapplicable. As noted above, the losses alleged by CWT that derive from a lost opportunity to compete on a level playing field for a contract have been found sufficient to prove irreparable harm. See, e.g., CRAssociates, 95 Fed. Cl. at 390. Accordingly, plaintiff has adequately demonstrated that it will suffer irreparable harm if injunctive relief is not provided.

### 2. The Balance of Hardships Weighs in Favor of an Injunction

Under this factor, "the court must consider whether the balance of hardships leans in plaintiff's favor," requiring "a consideration of the harm to the government and to the intervening defendant." Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 715 (2006). The government, citing the contracting officer's declaration, asserts that it will be significantly harmed by a directed award to CWT. The contracting officer explains that a directed award to CWT would result in the government procuring services from a company that as of today still cannot satisfactorily comply with the terms of the RFP. This argument is moot because, as the court has explained, it does not have the authority to direct an award to a contractor. The government further argues that an injunction ordering GSA to evaluate CWT's current technical acceptability would be fruitless because any proposal CWT could currently submit would not be technically acceptable, and agency resources would be wasted in the process. The government additionally asserts that allowing CWT to submit a revised final proposal would likely delay the transition from ETS1 to ETS2 and result in significant cost increases for the government.

On the other hand, CWT states that it is not requesting an opportunity to submit a revised proposal, and as a result, there is no need for GSA to incur costs associated with restarting the evaluation process. Rather, CWT asserts that the government need only verify CWT's system to

issue an authority to operate, just as it had to do with Concur and its remediation plan after contract award. Finally, CWT asserts that Concur will not be harmed because CWT has not asked that Concur's award be disturbed.

With respect to the delay that the government states is likely to occur, the Court of Federal Claims has observed that "'only in an exceptional case would [such delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests.'" Id. (quoting Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 399 (1999)); see also Serco Inc., 81 Fed. Cl. at 502 (same); Reilly's Wholesale, 73 Fed. Cl. at 715-16 (same). Defendant has offered no reason why this is such an exceptional case. Any harm to GSA stemming from potential delay to ETS2 transition is mitigated by GSA's ability to exercise its options under the current ETS1 contract through November 2015. Moreover, the government's assertion that it would be required to procure travel services from CWT even if its ETS2 system is not fully compliant is erroneous because an IDIQ contract merely allows CWT to compete for task orders, and it will only win and perform task orders if it meets RFP requirements at competitive prices and has an authority to operate. Further, with respect to an increase in transition costs, any harm flowing to any offeror or to itself stems from defendant's own arbitrary and capricious actions.

### 3. The Public Interest Will Be Served if the Court Enters an Injunction

"[T]he public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." PGBA, LLC v. United States, 57 Fed. Cl. 655, 663 (2003); see also Bilfinger Berger AG Sede Secondaria Italiana v. United States, 94 Fed. Cl. 389, 393 (2010) ("The public interest in preserving the integrity and fairness of the procurement process is served by enjoining arbitrary or capricious agency action . . . ."). Here, the public interest is best served by requiring the government to comply with federal procurement law–law that was intended to promote competition.

## V. CONCLUSION

For the reasons set forth above, it is hereby **ORDERED**:

1. The court **DENIES** defendant's motion to dismiss.

2. CWT's Motion for Judgment on the Administrative Record is **GRANTED**. The General Services Administration, its officers, agents, servants, employees and representatives, and all persons acting in concert and participating with them respecting the subject procurement, are ordered to conduct a reevaluation consistent with FAR 16.504(c), and in particular FAR 16.504(c)(1)(ii)(D)(1)(iii), and this court's decision. In the interim, the contract award to Concur shall remain in full force and effect.

3. The court **DENIES** defendant's and defendant-intervenor's cross-motions for judgment upon the administrative record.

4.      The court **DENIES** plaintiff's, defendant's, and defendant-intervenor's motions to strike.

5.      Prior to the release of this opinion to the public, the parties shall review it for competition-sensitive, proprietary, confidential, or other protected information. The parties shall confer and file a joint proposed redacted version of this decision by no later than **Monday, April 8, 2013**.

6.      The Clerk is directed to enter judgment on the administrative record in favor of plaintiff consistent with this opinion.


                                                 s/ Margaret M. Sweeney
                                                 MARGARET M. SWEENEY
                                                 Judge